IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Jurisdiction of the Armed Forces and Chaplaincy,<br><br>Plaintiff,<br><br>v.<br><br>Anglican Church in North America,<br><br>Defendant. | Civil Action No. 2:25-cv-12848-BHH<br><br>**ORDER** |

This matter is before the Court on Defendant Anglican Church of North America's ("Defendant" or "Church") motion to dismiss this case pursuant to the church autonomy doctrine, also known as the ecclesiastical abstention doctrine. (ECF Nos. 39; 39-1 through 39-4.) Plaintiff Jurisdiction of the Armed Forces and Chaplaincy ("Plaintiff" or "Jurisdiction") filed a response in opposition to Defendant's motion; Defendant filed a reply along with additional exhibits; and Defendant filed a supplement to its reply. (*See* ECF Nos. 42; 43; 43-1 through 43-14; 45.) Now, for the reasons set forth herein, the Court grants Defendant's motion and dismisses this action pursuant to the church autonomy doctrine.

**PROCEDURAL BACKGROUND**

Plaintiff filed its initial complaint on October 6, 2025, along with numerous exhibits, seeking temporary, preliminary, and permanent injunctive relief and damages under the trademark and unfair competition laws of the United States and South Carolina, for alleged violations of sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* (*See* ECF Nos. 1; 1-1 through 1-17.) Plaintiff filed a motion for temporary restraining order on

October 7, 2025, and the Court held an emergency hearing on October 8, 2025. (ECF Nos. 6, 8.) The Court deferred its ruling on the motion pending the filing of Defendant's response to the motion, and the Court instructed counsel to confer to determine whether any of the pending issues could be resolved without the Court's involvement. (ECF No. 10.) Defendant filed its response to Plaintiff's motion on October 13, 2025; Plaintiff filed a reply on October 15, 2025; and the Court resumed its hearing on the motion on October 17, 2025. (ECF Nos. 13, 21, 23.)

On November 6, 2025, the Court issued an order granting in part and denying in part Plaintiff's motion. (ECF No. 27.) In its order, the Court noted that counsel for Defendant conceded at the hearing that it would refrain from using Plaintiff's service mark, "Jurisdiction of the Armed Forces and Chaplaincy," as well as Plaintiff's trademark, "Anglican Chaplains," and Plaintiff's trademarked logo, and the Court therefore granted Plaintiff's motion as to those three items but denied the motion in all other aspects. (ECF No. 27 at 3-4.)

Following issuance of the Court's order, wherein the Court noted that it had "some concern that certain of Plaintiff's requests wade into ecclesiastical matters that are not appropriate for this Court to resolve," Defendant filed a motion to dismiss pursuant to Rule 12(b)(6) and the ecclesiastical abstention doctrine. (ECF Nos. 27 at 4; 34.) On December 22, 2025, however, Plaintiff filed an amended complaint with attached exhibits, and based upon the filing of Plaintiff's amended complaint, the Court found moot Defendant's initial motion to dismiss. (ECF Nos. 35; 35-1 through 35-25; 38.) Defendant then filed the instant motion to dismiss Plaintiff's amended complaint, again asserting that the church autonomy doctrine forbids this Court from entangling itself in Plaintiff's claims.

**STANDARD OF REVIEW**

Although Defendant's motion is filed on the docket as a "motion to dismiss for lack of jurisdiction," the motion itself is captioned as a "motion to dismiss pursuant to Rule 12(b)(6) and the church autonomy doctrine." The motion contains no reference to Rule 12(b)(1), but it does rely on matters outside the complaint. (ECF Nos. 39; 39-1 through 39-4; 43; 43-1 through 43-14.) As an initial matter, therefore, the Court considers whether it is appropriate to address Defendant's motion pursuant to Rule 12(b)(1) or (6) of the Federal Rules of Civil Procedure.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999); *see also Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (internal citations omitted) (explaining that a Rule 12(b)(6) motion "challenges the legal sufficiency of a complaint, considered with the assumption that the facts alleged are true"). In considering a Rule 12(b)(6) motion, the Court may "take judicial notice of matters of public record," "consider documents attached to the complaint," and consider documents attached to the motion to dismiss "so long as they are integral to the complaint and authentic." *Sec'y of State for Deference v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). Nevertheless, Rule 12(d) of the Federal Rules of Civil Procedure provides: "If, on a motion under Rule 12(b)(6) [ ], matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."[1] Fed. R. Civ. P. 12(d).

[1] In its response to Defendant's motion, Plaintiff notes that it "does not consent to converting [Defendant's] motion into one for summary judgment." (ECF No. 42 at 2.)

A motion to dismiss pursuant to Rule 12(b)(1), on the other hand, raises the fundamental question of whether the Court has jurisdiction to adjudicate the matter before it. Fed. R. Civ. P. 12(b)(1). In determining whether subject matter jurisdiction exists, the Court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). The plaintiff bears the burden of proof on questions of subject matter jurisdiction. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

After reviewing the applicable law, the Court notes that it is not entirely clear whether Defendant's motion raises an affirmative defense under Rule 12(b)(6) or presents a jurisdictional bar under Rule 12(b)(1). Nevertheless, the Court also notes that other district courts within the Fourth Circuit appear to have treated the issue as a jurisdictional challenge arising under Rule 12(b)(1).[2] For example, in *Edley-Worford v. Virginia Conference of United Methodist Church*, the Eastern District of Virginia explained:

> While neither the Supreme Court, nor the Fourth Circuit, has provided explicit guidance as to whether the ecclesiastical abstention doctrine constitutes a Rule 12(b)(1) jurisdictional bar, as opposed to a Rule 12(b)(6) affirmative defense, most courts have viewed the ecclesiastical abstention doctrine through a 12(b)(1) lens. *See, e.g., Byrd v. DeVeaux*, 2019 WL 1017602, at *4 (D. Md. Mar. 4, 2019) ("Defendants first argue that the First Amendment ecclesiastical abstention doctrine presents a jurisdictional bar to Plaintiff's claim. Challenges to subject matter jurisdiction are evaluated under Fed. R. Civ. P. 12(b)(1)."); *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017) ("[W]ithout definitive guidance otherwise from the Supreme Court or the D.C.

[2] Additionally, the Court notes that Plaintiff addresses the issue as one of subject matter jurisdiction in its amended complaint, specifically asserting that "[t]he Court's subject matter jurisdiction is not curtailed by the First Amendment's church autonomy doctrine, also known as the ecclesiastical abstention doctrine . . . ." (ECF No. 35 at 4.)

> Circuit, the Court will analyze defendants' arguments under the ecclesiastical abstention doctrine . . . under a Rule 12(b)(1) lens." (internal citation omitted)); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 248 n.7 (S.D.N.Y. 2014) ("It is somewhat unclear whether the First Amendment serves as jurisdictional bar or an affirmative defense to claims that require courts to review ecclesiastical decisions. Most district courts to consider the question have treated it as jurisdictional.").

430 F. Supp. 3d 132, 136 n.1 (E.D. Va. Dec. 30, 2019); *see also Doe v. Mercy High School, Inc.*, No. 1:23-cv-1184-JRR, 2024 WL 3103396, *11 (D. Md. June 24, 2024) (addressing an ecclesiastical abstention argument first because "application of the doctrine would deprive the court of subject matter jurisdiction"); *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 332 (4th Cir. 1997) (affirming the district court's dismissal of a claim for lack of subject matter jurisdiction where it called for "a decision about the nature, extent, administration, and termination of a religious ministry" that fell "within the ecclesiastical sphere that the First Amendment"); *Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002) (explaining that a court may "properly exercise jurisdiction" where a civil dispute "can be decided without resolving an ecclesiastical controversy"); *Holy Spirit Assn. for Unification of World Christianity v. World Peace & Unification Sanctuary, Inc.*, No. 3:18-cv-1508, 2022 WL 969057, *6 n.13 (M.D. Penn. March 30, 2022) (citing *Edley-Worford* and joining "the majority of courts to have considered the issue and [ ] treat[ing] the ecclesiastical abstention doctrine as a jurisdictional issue under Rule 12(b)(1)").

In light of the foregoing authority, and in the absence of any controlling authority to the contrary, the Court reviews Defendant's motion under the lens of Rule 12(b)(1).

## DISCUSSION

### I. Plaintiff's Claims

In its amended complaint, Plaintiff seeks permanent injunctive relief and damages for violations of sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a); the Defend Trade Secrets Act, 18 U.S.C. § 1836; the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, *et seq.*; and the South Carolina Trade Secrets Act, S.C. Code Ann. § 39-8-10, *et seq.* (ECF No. 35.) Plaintiff specifically introduces its complaint by emphasizing that the claims do not involve "a dispute between the parties concerning church discipline, church governance, or any other ecclesiastical matter." (*Id.* at 1.) Indeed, Plaintiff carefully pleads its claims as those of a corporate plaintiff who has suffered as a result of the alleged unlawful actions of a corporate defendant through its agents and CEO.[3] (*See id.* at 2.)

According to Plaintiff, the First Amendment's church autonomy doctrine does not curtail this Court's subject matter jurisdiction for two reasons. (*Id.* at 4.) Specifically, Plaintiff asserts:

> *First*, as set forth below, Plaintiff has never belonged to Defendant, has never been part of Defendant, and has, consequently, never been subject to Defendant's canonical rule. The matter before the Court is therefore neither doctrinal nor concerning an internal church rift, but instead a civil dispute between two independent corporations. *Second*, even if Plaintiff had been subject to Defendant's canons, nothing in Defendant's canons creates an express or implied trust in Plaintiff's organization or assets in favor of Defendant.

(*Id.* (emphasis in original).)

---

[3] Plaintiff does, of course, admit that both parties are not-for-profit *church* corporations. (ECF No. 35 at 3.)

As to the facts alleged in Plaintiff's amended complaint, Plaintiff asserts that it "was founded in 2007 as an independent religious organization by Lieutenant Colonel (USAF) (Ret.) Derek L.S. Jones (now Bishop Jones) and others for the purpose of providing a spiritual residence, training and oversight to Anglican Chaplains® who serve in the military and other occupations, and to endorse chaplains from the Anglican tradition for Government service." (ECF No. 35 at 5-6.) Plaintiff further asserts that its original name was "The Deanery for the Armed Forces and Chaplaincy" ("the Deanery") and that "Plaintiff was created as part of the Convocation of Anglicans in North America ("CANA"), which was in turn part of the Church of Nigeria (Anglican Communion)." (*Id.* at 6.) Plaintiff states that Derek L.S. Jones ("Bishop Jones") "has been Plaintiff's head from its inception." (*Id.*) Plaintiff further claims that both it and CANA owe "their existence to foundational disagreements over theological and social issues within the Episcopal Church of the United States." (*Id.*) According to Plaintiff, "CANA was founded in 2005 to provide oversight to orthodox Anglican churches for African immigrant communities in North America and to other congregations that had left the Episcopal Church over their disagreements." (*Id.*) To that end, Plaintiff contends that Bishop Jones founded Plaintiff in response to the schism in the Episcopal church and that "Plaintiff has been providing endorsement of Anglican chaplains as an essential element of its purpose and function since its founding in 2007." (*Id.*)

Next, Plaintiff asserts that Defendant was founded in 2009 "as a new Anglican entity with which the Convocation of Anglicans in North America became a ministry partner." (*Id.*) Plaintiff further asserts that Defendant "became part of Plaintiff's clientele of Anglican provinces and dioceses that sought Plaintiff's endorsement for their Chaplains." (*Id.*)

According to Plaintiff, it "maintained affiliations with" Defendant in the past, but it currently is "an independent ecclesiastical entity unaffiliated with any other diocese or province of the Anglican Church." (*Id.* at 7.)

Plaintiff asserts that Bishop Jones was first consecrated as an Anglican bishop in 2007, "working for the Church of Nigeria (Anglican Communion) (but not as a Church of Nigeria bishop) and CANA." (*Id.*) Plaintiff further asserts that Bishop Jones assumed the title of "Bishop of the Armed Forces and Chaplaincy" in 2010, and that the Deanery became known as the Diocese of the Armed Forces and Chaplaincy in 2012." (*Id.*) According to Plaintiff, it adopted the name "Special Jurisdiction of the Armed Forces and Chaplaincy" in 2013. (*Id.*)

According to the amended complaint and documents attached to the complaint, in 2016 Bishop Jones filed for the incorporation of Plaintiff as a not-for-profit corporation under the name, "Special Jurisdiction of the Armed Forces and Chaplaincy." (ECF No. 35-1 at 3-4, 8.) Bishop Jones subsequently filed to have the name amended to "Jurisdiction of the Armed Forces and Chaplaincy" on February 1, 2024. (*Id.*) Plaintiff asserts, however, that it has provided "ecclesiastical endorsement services to [Defendant] and other Anglican provinces and dioceses solely as an independent supplier of such services" from 2012 to the present time. (ECF No. 35 at 8.) Plaintiff also alleges that "[f]rom 2013 until February 1, 2024, Plaintiff's ecclesiastical and corporate name was "Special Jurisdiction of the Armed Forces and Chaplaincy," and that "[f]rom 2014 until September 22, 2025, Plaintiff authorized [Defendant] to use its name (or former name), 'Special Jurisdiction of the Armed Forces and Chaplaincy,' to refer to Plaintiff's ministry, although Plaintiff disapproved of Defendant's uses of the phrase in its draft Canons and told [Defendant] so." (*Id.* at 8-9.)

Regarding the trademarks at issue in this case, Plaintiff asserts that it applied to the U.S. Patent and Trademark Office in 2016 to register as trademarks the phrase "Anglican Chaplains®" and a logo containing the phrase "Anglican Chaplains Ad Gloriam Dei®," and the trademark office approved registration in 2018. (*Id.* at 9.) Additionally, Plaintiff asserts that it applied in 2020 to register the name "Jurisdiction of the Armed Forces and Chaplaincy" as a service mark, and the trademark office granted registration in 2023. (*Id.*)

Plaintiff asserts that on September 21, 2025, Defendant "interfered with the governance of Plaintiff by purporting to 'inhibit' the activities of Plaintiff's CEO and ecclesiastical head, Bishop Jones." (*Id.* at 11.) According to Plaintiff, Defendant did so to "usurp Plaintiff's chaplain-endorsement authority and take over control of Plaintiff's global network of parishes, missions, and chapels." (*Id.*)

Plaintiff further asserts that on September 21, 2025, Archbishop Steve Wood sent a letter to all Anglican Chaplains® endorsed by Plaintiff, representing that Bishop Wood had been "'inhibited . . . from the exercise of his ministry.'" (*Id.* (quoting ECF No. 35-3).) According to Plaintiff, this letter interfered with Plaintiff's endorsing relationships, and Plaintiff asserts, *inter alia*, that its "governing documents specify that Bishop Jones is the officer responsible for exercising Plaintiff's authority to endorse chaplains." (*Id.*)

Plaintiff asserts that on September 22, 2025, Plaintiff notified Defendant "'that the Jurisdiction of the Armed Forces and Chaplaincy is terminating its affiliation with [Defendant]" and that Defendant "may not meet nor contact our member Chaplains or use the trademark Anglican Chaplains." (*Id.* at 12 (quoting ECF No. 35-4).) Plaintiff next asserts that, on September 23, 2025, its lawyers sent Defendant a "cease and desist letter," instructing Defendant not to use Plaintiff's registered marks or the phrase, "Special

Jurisdiction of the Armed Forces and Chaplaincy," and not to interfere with Plaintiff's and Bishop Jones' contracts and business relationships. Plaintiff further asserts that Defendant disregarded these instructions and continued to appropriate Plaintiff's protected marks and "usurp its ecclesiastical and commercial identity," and that until September 21, 2025, Defendant had never used the phrase "Special Jurisdiction of the Armed Forces and Chaplaincy," except to refer to Plaintiff and its ministry to Anglican Chaplains®. (*Id.* at 13.)

Plaintiff alleges that on September 22, 2025, Archbishop Wood sent a letter to the Executive Director of the Armed Forces Chaplaincy Board indicating that "'[Defendant's] former endorser, Bishop Derek Jones, has withdrawn from [Defendant] and thus can no longer serve as the Ecclesiastical Endorser for [Defendant's] Chaplains.'" (*Id.* at 14 (quoting ECF No. 35-6).) According to Plaintiff, this letter contained two misrepresentations: "first, that Bishop Jones was personally the designated ecclesiastical endorser of Anglican Chaplains® (it is Plaintiff, not its Bishop), and second, that through Bishop Jones, Plaintiff could no longer endorse chaplains of ACNA (which it can and, if requested, must continue to do)." (*Id.*)

Plaintiff also asserts that on September 23, 2025, Defendant published a letter containing materially false statements, promoting the "Special Jurisdiction of the Armed Forces and Chaplaincy," and declaring that "[]the Special Jurisdiction, under which the chaplains serve, continues to exist within [Defendant] regardless of Bishop Jones' withdrawal or the withdrawal of any entities under his control." (*Id.* at 15-16 (quoting ECF No. 35-9).) Plaintiff further alleges:

> As a legacy of its former relationship with Plaintiff, [Defendant] has an empty space in its governing documentation that still uses Plaintiff's name to refer to a ministry—Plaintiff's ministry of institutional chaplaincy—which

> [Defendant] can no longer claim to perform. Yet [Defendant's] documentation still holds itself out as having a "Special Jurisdiction of the Armed Forces and Chaplaincy" governed by a "Bishop of the Armed Forces and Chaplaincy." [Defendant] is using Plaintiff's name and Bishop Jones's title to recruit chaplains to [Defendant].

(*Id.* at 16.)

Plaintiff next alleges that on September 25, 2025, Defendant published a press release announcing that it "had deposed Bishop Jones from his title as Bishop of the Armed Forces of Chaplaincy," and had elected a replacement. (*Id.* (quoting ECF No. 35-10).) Plaintiff further asserts, however, that Defendant did not depose Bishop Jones and that he continues in the role of Bishop of the Armed Forces and Chaplaincy as the head of Plaintiff. (*Id.* at 17.)

Plaintiff alleges that Defendant's campaign to replace it has harmed him by causing Anglican Chaplains® to disassociate with it and by interfering with its relationship with the Department of War. (*Id.* at 17-18.) Plaintiff further alleges that Defendant has pressured certain employees of Plaintiff to betray Plaintiff by, among other things, using without authorization Plaintiff's trademarks and other proprietary information. (*Id.* at 18-24.) According to Plaintiff, Defendant's actions were motivated by malice on the part of Defendant's leadership towards Bishop Jones. (*See id.* at 24-27.)

In all, Plaintiff asserts the following claims against Defendant: (1) infringement of the registered service mark; (2) infringement of registered trademarks; (3) commercial misrepresentation pursuant to section 43(a)(1)(A) of the Lanham Act; (4) false advertising pursuant to section 43(a)(1)(B) of the Lanham Act; (5) violation of SCUTPA; (6) misappropriation of corporate identity; (7) tortious interference with employer contract; (8) tortious interference with chaplain contracts; (9) slander of title; (10) conversion of

proprietary information; (11) violation of Defend Trade Secrets Act, 18 U.S.C. § 1836; (12) violation of the South Carolina Trade Secrets Act; and (13) permanent injunction. (*Id.* at 27-53.)

## II. Defendant's Motion to Dismiss Pursuant to the Church Autonomy Doctrine

Defendant seeks dismissal of this action pursuant to the church autonomy doctrine, also known as the ecclesiastical abstention doct asserting that Plaintiff's claims all stem from a dispute within the Church over, among other things, its determinations of organization and polity, its disciplinary proceedings regarding Bishop Jones, and the control and corporate identity of the Special Jurisdiction of the Armed Forces and Chaplaincy. (ECF No. 39-1 at 2.) Defendant further asserts that Plaintiff's claims stem from the Church's "final and binding determinations regarding its office, the Bishop of the Armed Forces; and the church's findings and decisions regarding a purported schism led by Derek Jones in derogation of both his Oath of Obedience to the Archbishop and his Oath of Conformity." (*Id.*) According to Defendant, the Special Jurisdiction for the Armed Forces and Chaplaincy ("Special Jurisdiction") "has been and remains a ministry of and operated under the control of [Defendant] and its Archibishop. It was created under [Defendant's] canons and is an important component of [Defendant's] religious mission." (*Id.* at 3.) Defendant claims that, following its formation in 2009, it received Bishop Jones as a Suffragan Bishop in 2010, and that following a July 2010 Protocol (among Defendant, the Church of Nigeria, and CANA), "CANA's Deanery for the Chaplaincy, which had been led by Bishop Jones, was assumed by [Defendant]." (*Id.*) Defendant then asserts that its "Provincial Council and Provisional Assembly adopted a canon in 2014 to create the [Special Jurisdiction] to assume the ministry of the Deanery [ ]." (*Id.*) Defendant further

asserts that "the College of Bishops elected Bishop Jones as Bishop of the Armed Forces to lead the [Special Jurisdiction], which remained integrated into the ACNA's ministry and under the ACNA's ecclesiastical control and the oversight of the Archbishop," and that "Bishop Jones was installed as titular head of the Special Jurisdiction, "which remained a ministry of [Defendant] and under its ecclesiastical control." (*Id.*) As a result, according to Defendant, Bishop Jones executed the required Oath of Obedience to the Archbishop and his successors and executed an Oath of Conformity. (*Id.*)

According to Defendant, Bishop Jones created an Alabama nonprofit in 2016 under the name "Special Jurisdiction of the Armed Forces and Chaplaincy" to carry out some of the administrative functions of the ministry, but "*[a]t no time before September 2025 was the ministry known as the [Special Jurisdiction] separate from or independent of the organization and polity of [Defendant].*" (*Id.* (emphasis added).) Defendant further asserts that its canons "require the approval of [its] Executive Committee for any change to the [Special Jurisdiction's] canons." (*Id.*) And Defendant contends that in 2020, the Special Jurisdiction requested permission to change its name to "Jurisdiction of the Armed Forces and Chaplaincy," but that, at its meeting on September 15, 2020, Defendant's Executive Committee voted unanimously to reject the name change. (*Id.* at 15-16.) According to Defendant, therefore, the subsequent use of the name "Jurisdiction of the Armed Forces and Chaplaincy" was unauthorized and in violation of Defendant's canons. (*Id.* at 16.)

Defendant further contends that, in 2021, it and the Special Jurisdiction issued a joint statement recognizing that the so-called Jurisdiction of the Armed Forces and Chaplaincy was fully integrated into Defendant and "operated as one of its ministries, was under its hierarchical control and was part of its organization and polity." (*Id.*) Defendant contends

that, as a ministry operating under the hierarchical control of *it*, any action of Plaintiff in furtherance of Defendant's religious mission – to include the creation of financial systems and accounts, the filing of tax documents, filings with the Alabama Secretary of State or other governmental entities, and the filing for and obtaining trademark or copyright registrations – was performed within Defendant's ecclesiastical authority and control. (*Id.*) In all, Defendant argues:

> Adjudication of Plaintiff's claims in this lawsuit would clearly require the Court to inquire into religious matters and ecclesiastical decision-making to a degree that is simply impermissible under the Constitution. Plaintiff's claims – trademark infringement, unfair trade practices, tortious interference, misappropriation of corporate identity, slander of title, and false or misleading advertising – are nothing more than an elliptical way of challenging the [Defendant's] attempt to discipline Bishop Jones and maintain the direction of its chaplaincy ministry. These matters are conclusively protected from judicial entanglement by the Religion Clauses of the First Amendment of the United States Constitution, and this Court lacks the authority or jurisdiction to make any determinations regarding these matters.

(*Id.* at 5.)

In response to Defendant's motion, Plaintiff argues that this case involves nothing more than "a corporate dispute," at the heart of which is Defendant's "failed hostile takeover of [Plaintiff] and violations of trademark, trade secrets, and unfair competition laws." (ECF No. 42 at 1.) According to Plaintiff, the ecclesiastical abstention doctrine does not apply because this case involves purely and exclusively secular claims that may be resolved by the application of neutral principles of law. (*Id.* at 5.) To that end, Plaintiff asserts that it is not asking the Court to interfere with Defendant's internal governance and that there is no ecclesiastical schism before the Court. (*Id.* at 5-7.) Additionally, Plaintiff contends that this case does not involve the ministerial exception, as Plaintiff is not asking the Court to adjudicate the ecclesiastical disciplinary facing Bishop Jones, and there is otherwise no

nexus between the ministerial exception and the facts of this case. (*Id.* at 9-10.) Plaintiff also asserts that this case does not involve church governance, as Plaintiff's claims concern only corporate wrongdoing. (*Id.* at 10.) And Plaintiff contends that Defendant's arguments concerning discovery are premature and incorrect. (*Id.* at 11.)

Plaintiff does, however, admit that whether Defendant has ever owned or controlled Plaintiff is a question of fact, although it reemphasizes its position that it has never been part of Defendant.[4] (*Id.* at 14.) As to Defendant's arguments to the contrary, Plaintiff states that "[o]nly the Court can determine, by applying neutral principles of law, whether [Plaintiff] is autonomous." (*Id.*) Furthermore, Plaintiff asserts, "even if, *arguendo*, [Plaintiff] were ecclesiastically subject to [Defendant], that does not mean that [Defendant] owns [Plaintiff], its marks, its chaplains, or its bank accounts. Only the Court on summary judgment, or the trier of fact at trial, can determine whether ACNA 'owns' JAFC." (*Id.* at 15.) Also according to Plaintiff, nothing in Defendant's canons entitles it to Plaintiff's property. (*Id.* at 17.)

## III. The Ecclesiastical Abstention Doctrine

The Establishment and Free Exercise Clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. The First Amendment thus protects the right of churches and other religious institutions "to decide for themselves, free from state

---

[4] Plaintiff states in its amended complaint that it was founded in 2007 and that Defendant was founded in 2009, and Plaintiff argues in response to Defendant's motion that "Plaintiff's inception of and role in endorsing Anglican Chaplains® predates [Defendant's] very existence as an organization. (*See* ECF Nos. 35 at 5-6; 42 at 2.) The Court notes however, that the records provided by Plaintiff, who also insists that this case is nothing more than a "corporate dispute," indicate that Plaintiff was not *incorporated* until 2016 as "Special Jurisdiction of the Armed Forces and Chaplaincy," with its name later amended to "Jurisdiction of the Armed Forces and Chaplaincy" on February 1, 2024. (ECF No. 35-1 at 3-4, 8.) Regardless, the Court notes that the parties vigorously dispute the facts underlying Plaintiff's creation as well as its proper place within Defendant's hierarchical structure.

interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012). "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." *Our Lady of Guadalupe Sch. v. Morissey-Berru*, 591 U.S. 732, 746 (2020).

"In keeping with the First Amendment's proscription against the 'establishment of religion' or prohibiting the 'free exercise thereof,' civil courts have long taken care not to intermeddle in internal ecclesiastical disputes." *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 330 (4th Cir. 1997). Historically, these disputes have involved church property or the appointment and selection of clergy, but more recently, the Supreme Court has held that the ecclesiastical abstention doctrine "applies with equal force to church disputes over church polity and church administration." *Serbian E. Orthodox Diocese for U. S. of Am. and Canada v. Milivojevich*, 426 U.S. 696, 710 (1976). "For where resolution of the disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Milivojevich*, 426 U.S. at 709.

Ecclesiastical abstention is "not without limits," however, and it generally "does not apply to purely secular decisions, even when made by churches." *Bryce v. Episcopal Church in the Diocese of Colorado*, 289 F.3d 648, 657 (10th Cir. 2002). "The doctrine

contemplates that courts should avoid controversies that require courts to rely on religious doctrine or second-guess a religious tribunal; the doctrine does not contemplate avoidance of civil controversies merely because the controversies involve religious parties or spring incidentally from religious law." *Zinski v. Lib. Univ., Inc.*, 777 F. Supp. 3d 601, 649 (W.D. Va. 2025) (citing *Milivojevich*, 426 U.S. at 709). In addressing the contours of the ministerial exception, the Fourth Circuit has emphasized that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer." *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000). The relevant inquiry thus is "whether the employment dispute is ecclesiastical, meaning it concerns 'discipline, faith, internal organization, or ecclesiastical rule, custom or law,'" or whether it is a case involving "purely secular disputes between third parties and a particular defendant, albeit a religiously affiliated organization." *Billard v. Charlotte Catholic High Sch.*, No. 3:17-cv-00011, 2021 WL 4037431, at *11 (W.D.N.C. Sept. 3, 2021), *rev'd and remanded on other grounds*, 101 F.4th 316 (4th Cir. 2024).

The question this Court must resolve here, therefore, is whether this case involves an ecclesiastical dispute between Plaintiff and Defendant about "discipline, faith, internal organization, or ecclesiastical rule, custom[,] or law," or whether this case involves "purely secular disputes." *Gen. Council on Fin. & Admin. of the United Methodist Church v. California Superior Ct.*, 439 U.S. 1369, 1373 (1978). After careful consideration, the Court finds that this case undoubtedly involves ecclesiastical disputes, despite Plaintiff's artful pleading otherwise. *See Dixon v. Edwards*, 290 F.3d 699, 714 (4th Cir. 2002) ("[C]ivil courts lack any authority to resolve disputes arising under religious law and polity, and they

must defer to the highest ecclesiastical tribunal within a hierarchical church applying its religious law." (citing *Milivojevich*, 426 U.S. at 709)); *Serbian E. Orthodox Diocese*, 426 U.S. at 708 ("In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When . . . ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.").

Stated succinctly, the Court finds that Plaintiff's claims clearly involve matters not only of Bishop Jones' church discipline, but also fundamental questions of internal church organization and polity. Indeed, to adjudicate any of Plaintiff's claims, the Court would be forced to wade into these ecclesiastical disputes and delve into, for example, the extent to which both Bishop Jones and Plaintiff are subject to the ecclesiastical control of Defendant, which the Court believes would run afoul of the First Amendment. In all, the Court fully agrees with Defendant that Plaintiff's claims:

> will certainly require the Court to broadly interpret and resolve matters of church organization, governance, and ecclesiastical authority, matters that are constitutionally forbidden to the civil courts. Even when packaged as claims under the Lanham Act, or trade secrets, torts, and state unfair competition laws, the pleaded facts and requested remedies will compel determinations about *who leads a church ministry, who is the rightful "Bishop of the Armed Forces and Chaplaincy," whether the chaplaincy ministry sits within the Anglican Church in North America's hierarchical structure, and which church authority controls the ministry's name, records, and marks. Those are quintessential ecclesiastical questions.*

(ECF No. 39-1 at 2 (emphasis added).) As the Supreme Court aptly stated in *Our Lady*, "[t]he First Amendment outlaws such intrusion." 591 U.S. at 746 (2020); *see also The*

*Lutheran Church*, 178 F.4th at 197 (explaining that the First Amendment guides courts in this country "to interfere as little as possible in the affairs that constitute governance of ecclesiastical bodies").

Ultimately, this Court has neither the desire, nor the authority, to entangle itself into such an essentially religious controversy.[5] Accordingly, the Court grants Defendant's motion to dismiss this matter pursuant to the church autonomy doctrine.

## CONCLUSION

Based on the foregoing, the Court hereby **grants** Defendant's motion (**ECF No. 39**) and dismisses this case for lack of jurisdiction.[6]

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Court

September 28, 2026
Charleston, South Carolina

---

[5] As the Supreme Court first articulated in *Watson v. Jones*:

> The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

80 U.S. 679, 728-29 (1872).

[6] A dismissal for lack of subject matter jurisdiction is necessarily a dismissal without prejudice.